## Banks v. Commonwealth

February 21, 1950.

S. M. Ward, Judge.

298

C. A. Noble and H. B. Noble for appellant.

A. E. Funk, Attorney General, and Zeb A. Stewart, Assistant Attorney General, for appellee.

JUDGE KNIGHT—Affirming.

Appellant under an indictment for willful murder of Edward Gross was convicted of voluntary manslaughter and his punishment was fixed by the jury at confinement in the penitentiary for a period of twenty-one years. He appeals from a judgment based on that verdict, asking reversal on two grounds: (1) the court erred in refusing to allow appellant the right to complete the cross-examination of one of the Commonwealth's principal witnesses; (2) the verdict of the jury was not supported by competent evidence, and the court should have directed a verdict for the defendant. These will be considered in that order.

I

The first question raised by appellant appears to be one of first impression in this state since we have not been cited by either side a case from this jurisdiction involving this question nor have we found one on our independent research . The question presented is of rare occurrence, one upon which there has been but little judicial authority.

If appellant had been denied the right to cross-

examine a witness, he would undoubtedly have been denied his constitutional right since the right is granted every person accused of a crime to be confronted with witnesses against him, and this includes the right to cross-examine these witnesses. The record in this case shows that the Commonwealth put Silas Stewart, who claimed to be an eyewitness, on the stand and asked him 36 questions to develop his knowledge of the killing. On cross-examination he was asked 51 questions covering the main points brought out in direct examination. At that point he had an attack of some kind and fell to the floor from his chair and the doctor ordered him sent home. He was unable to complete his testimony and the court overruled defendant's motion to set aside the swearing of the jury and continue the case.

The case of People v. Cole, 43 N. Y. 508, cited and relied on by appellant, is distinguishable from the case at bar. In that case the witness had been sworn and examined in chief and had given material evidence against the defendant. Before there was opportunity to cross-examine her she fainted and became severely ill, rendering her cross-examination impossible, and her evidence in chief, without cross-examination, was submitted to the jury over objection. The court held that as this evidence might have injured the defendant, his request that it should be struck out and withdrawn from the jury should have been granted. This is quite different from the case at bar where there was substantial and seemingly almost complete cross-examination of the witness.

In the case of People v. Pope, 108 Mich. 361, 66 N. W. 213, a witness became ill before the close of the cross-examination, fainted and was carried from the court room. The defense reserved the right to cross-examine her further if they desired. Shortly after the prosecution rested, one of defendant's counsel stated that he desired to ask the witness three or four questions. She was too ill to appear in court. The prosecutor then offered to go to her home with prisoner's counsel to complete the examination but this offer was declined. No motion was made to strike out the testimony of the witness nor was any reason shown why a further cross-examination was desired. It was held that the proper course for the defendant would have been a mo-

tion to strike out the testimony. Having failed to do so, he could not now be heard to object that further cross-examination was desired. In the case at bar no motion to strike the testimony of the witness was made nor was it indicated to the court what further information was sought to be produced by additional cross-examination even though the motion was made to discharge the jury and continue the case.

We think the court did not abuse its sound discretion in refusing to discharge the jury under the circumstances of this case because it appears to us that the cross-examination was, to all intents and purposes, completed when the witness collapsed. Furthermore, testimony of the witness was largely cumulative and was similar to that given by his. wife Ruby Stewart, who answered 51 questions on cross-examination, the same number he had answered. Nor do we see how the collapsing of a witness, who was testifying against him, tended to incite the passion and inflame the minds of the jurors against appellant when they went to the jury room and as a result were not governed by the evidence, as appellant contends. It is just as reasonable to assume that it would have the opposite effect and result in a sympathetic feeling toward the accused.

## II

Deceased Ed Gross, about 34 years of age, and his brother, J. B. Gross, had been together on the afternoon of July 16, 1949, and had been drinking liquor. They left the home of J. B. late in the afternoon of that day to go to the home of appellant on Buffalo Branch, about a mile from the home of J. B., for the purpose of getting a dog belonging to Ed, taking with them a pint of whiskey and a 22 rifle. Upon their arrival at appellant's home the three apparently engaged in friendly conversation, in consuming the pint of liquor, and in target practice with the rifle. When they finished these activities and Ed and J. B. were about to leave, appellant invited them to supper but they declined saying they had had supper, and started down through the corn patch toward the road, J. B. leading the dog, and Ed carrying the rifle. Up to this time there is nothing in the record to show there had been any dispute, or argument, or trouble between the parties, and no apparent reason for the killing which later followed. Up to this

point there is no conflict in the testimony, but from this point forward the testimony is conflicting as to how the killing occurred.

According to the evidence produced by the Commonwealth, Ed and J. B. became separated on their way through the corn patch and J. B. had gone ahead of Ed. When he had gone about 100 yards J. B. heard two shotgun shots and went back to find Ed lying dead in the path about 50 yards from appellant's home. His rifle was nearby and he had a large gaping hole in his left chest near his heart, apparently made by the full blast from a shotgun at close range. Appellant was standing nearby with a shotgun. J. B. said to appellant "You have killed my brother," whereupon appellant pointed his gun toward J. B. and told him to get out of there or he would kill him. J. B. did not see appellant fire the gun. The Commonwealth produced two witnesses who testified they saw the appellant shoot the deceased with a shotgun at close range. These were Ruby Stewart and her husband Silas Stewart who lived across the branch about 150 to 175 yards from appellant's home, the corn patch where Ed's body was found being somewhat nearer and between the two homes. Mr. Stewart, corroborated the testimony of J. B. Gross by testifying that when J. B. went back when the shot was fired and said to appellant "You have killed my brother," he heard appellant say "I will kill you too if you don't get out of here." It was getting dark and both these witnesses were some distance from the place of the killing and could not give much detail of what led up to the actual killing, and other evidence introduced by the Commonwealth throws little light on that point.

Appellant 54 years old admits he killed deceased with a single shot from a shotgun but contends that the killing was done in self-defense. According to his testimony, corroborated to some extent by his wife, she had complained to him that something was eating the vegetables in the garden and after they had finished supper, which was about half an hour after the Gross boys had left their place, he and his wife went to the garden. He took with him his single barrel shotgun, believing damage to the garden was being caused by rabbits. While they were walking in the garden Ed Gross appeared about ten steps from him saying "Sam, I come back to

kill you about the dog,'' and brought down his rifle on him, advancing until it was almost in appellant's face; that appellant grabbed the rifle with his left hand and it went off. He then brought his own gun up, which had been resting on the toe of his shoe, and shot deceased. Joe Holbert, testifying for the defense, said before Ed Gross started to appellant's home on the afternoon of the killing, he borrowed some 22 rifle cartridges from the witness, saying "Sam Banks has shot my dog's leg off and I am going up there and kill him or get killed.'' On rebuttal the credibility of this witness was impeached by two witnesses who testified that his reputation for truth and veracity was bad. Appellant admitted on cross-examination that he had twice before been convicted of a felony. The court properly admonished the jury that it would consider that testimony not as evidence in the case, but only as it affected his credibility as a witness.

Without detailing other testimony, all of which has been carefully read by us, it can be seen that it is conflicting. There were two theories of the case with testimony to support each and it is within the province of the jury to accept or reject the testimony and to determine from all the evidence in the case whether or not appellant acted in self-defense. Breckenridge v. Commonwealth, 176 Ky. 686, 197 S. W. 395. Appellant's admission that he killed deceased and the sufficiency of his evidence that it was done in self-defense was a question for the jury. Fleming v. Commonwealth, 219 Ky. 697, 294 S. W. 153.

We are of the opinion that the lower court did not err in refusing to peremptorily instruct the jury to find appellant not guilty and the judgment is therefore affirmed.