410 So.2d 689 (1981)
STATE of Louisiana
v.
Vernon CHAPMAN.
No. 80-KA-2513.
Supreme Court of Louisiana.
September 8, 1981.
On Rehearing January 25, 1982.
On Rehearing March 12, 1982.
*693 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Marion B. Farmer, Dist. Atty., William R. Alford, Margaret A. Coon, Abbott J. Reeves, Asst. Dist. Attys., for plaintiff-appellee.
Garic K. Barranger, Brady M. Fitzsimmons, Covington, for defendant-appellant.
*694 WALLACE A. EDWARDS, Justice Ad Hoc.[*]
Vernon Chapman, convicted by an unanimous twelve person jury of aggravated rape and sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence, appeals. We affirm.
The basic thrust of Chapman's appeal, which specifies thirty-three errors, is that Chapman did not commit the offense with which he was charged.
Appellant's numerous specifications of error, taken as a whole, attempt to show that 1) the trial court was prejudiced against Chapman, 2) the crime caused the jury to be racially prejudiced, and 3) grave doubts exist as to the guilt of defendant.
The record shows neither a prejudicial judge nor jury. Appellant got a fair trial. Under our system of justice, that is the best that can be provided. That the jury found appellant guilty is an irrevocable fact. This Court cannot re-try the case on a "no doubt" standardit must review the jury's decision on a "beyond a reasonable doubt" standard.
A very close reading of the entire record convinces this Court that there was sufficient evidence upon which the jury could base its finding that the defendant was guilty of aggravated rape beyond a reasonable doubt.

FACTS
On June 3, 1979, at approximately 2:30 a. m., the victim, age 57, was awakened by a noise coming from the porch area of her Madisonville home. She got up and through the windows of her porch, saw the defendant trying to open a porch window. He held something made of shiny metal in his hand. She asked what he was doing and he said, "open the door, I'm stabbed." She said, "I'll call the police," and ran toward her phone to do so. At that point, the defendant crashed through the glass doors and pushed the victim down, cutting her leg on some of the glass. He pulled the victim into the dark bedroom and raped her. He stole money from her purse and then left the house. She followed him out, hid behind some vines, saw him run off and then heard a car start and drive off.
When the police arrived, the victim described her assailant as a light-skinned black man with a modified afro. She also described his height, weight, approximate age and shirt.
Leon Tyrney is the Chief of Police in Madisonville, which has a population of approximately 950. He testified that he knows most of the Madisonville residents and upon hearing the victim's description of her assailant, he immediately sent Sergeant Badon out to pick up the defendant for questioning because the defendant usually wore the type of hospital scrub shirt which the victim had described.
Chief Tyrney testified that when he arrived at the defendant's mobile home, he observed tire tracks in the dew on the ground which led to the defendant's automobile. The car had no dew on it and the motor was still hot. The defendant's wife answered the door and admitted the defendant had arrived home just a short time before. The defendant was lying in bed, without a shirt. The police chief observed a cut on his shoulder and on his side. Clothing on the floor had blood stains. The defendant was advised of his rights, although he was told he was not under arrest. Defendant was taken to the scene of the crime to be identified by the victim, but she had left to go to the hospital. Therefore, at approximately 4:00 a. m., the defendant was taken to the hospital where the victim was being treated. The defendant was brought before her with his hands in cuffs behind his back. The victim then immediately identified him as her assailant.
ASSIGNMENTS OF ERROR NUMBERS 1, 2, 3 AND 4
These assignments of error urge that the trial judge erred in failing to excuse *695 for cause certain prospective jurors. The defendant exhausted all of his peremptory challenges before the completion of the jury panel and is therefore entitled to raise this argument on appeal. State v. Monroe, 366 So.2d 1345 (La.1978).
La.C.Cr.P. Art. 797 reads in pertinent part:
"The state or the defendant may challenge a juror for cause on the ground that:
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict."

NO. 1
Mr. Mickelborough, a prospective juror, admitted on voir dire examination that he had read the newspaper accounts of the case and had formed an opinion as to the defendant's guilt or innocence. He stated "there would be some difficulty" in his serving as an impartial juror. However, when the court questioned him further concerning his ability to decide the case based only upon the evidence presented in the courtroom, the juror stated that he would be able to do that. Under cross-examination by defense counsel, he firmly stated that if, at close of the evidence, he was not certain whether the defendant was in fact guilty, he would vote to acquit.
As set forth in State v. McIntyre, 381 So.2d 408, 410 (La.1980):
"This court has repeatedly held that the trial court is vested with broad discretion in ruling on challenges for cause and that the trial court's ruling will be reversed only when it appears, upon review of the voir dire as a whole, that the court's exercise of its discretion has been arbitrary or unreasonable, resulting in prejudice to the accused. State v. Dickinson, 370 So.2d 557 (La.1979); State v. Webb, 364 So.2d 984 (La.1978); State v. Drew, 360 So.2d 500 (La.1978). Furthermore, a charge of bias may be removed by the rehabilitation of a prospective juror. See State v. Webb, supra; C.Cr.P. 797."
In McIntyre, supra, three jurors were challenged on the basis of their exposure to the case via newspaper accounts. One of those jurors had formed an impression that the defendant was guilty; nevertheless, this Court decided that:
"From a review of the record we cannot conclude that the trial court abused its discretion in denying the defendant's challenges for cause against these jurors. The circumstances do not indicate that the jurors could not be fair and impartial. The facts brought out by the defendant are not so strong as to cause us to overturn the trial court's exercise of its broad discretion in this area."
A similar result is indicated in the present case where Mr. Mickelborough was rehabilitated by the trial court.
This assignment of error lacks merit.

NO. 2
Following the prosecutor's discussion of the equal weight to be accorded the testimony of a police officer, Ms. Kimbrell, a prospective juror, stated that due to a prior bad experience with the district attorney's office and the court, she was not sure that she could be fair and impartial. She was immediately excused for cause by the trial judge. The defendant argues that the court's failure to make any attempt to rehabilitate this juror, who stated a bias against the state, contrasted sharply with the practice he employed when jurors stated a preconceived bias against the defendant.
The defendant accuses the trial court of "assisting the state" in selection of the jury, yet this is the only instance of such assistance *696 to which the defendant refers. As the state argues, one instance does not establish a pattern of assistance.
La.C.Cr.P. Art. 786 allows the trial court discretion in controlling the scope of the voir dire examination although the jurisprudence has held that counsel must be afforded wide latitude in conducting the voir dire. State v. Hawkins, 376 So.2d 943 (La. 1979).
In the present case, the defendant made no attempt to rehabilitate this juror and raised no contemporaneous objection to the court's dismissal of Ms. Kimbrell for cause. Compare, State v. Claiborne, 397 So.2d 486 (La.1981). The defense has the same right to rehabilitate a prospective juror as the state, if counsel chooses to exercise it. Under La.C.Cr.P. Art. 841, defendant's failure to object precludes review by this Court on appeal. State v. Alexander, 351 So.2d 505 (La.1977).
This assignment lacks merit.

NO. 3
The defendant objects to the trial court's failure to excuse prospective juror, Mrs. Holden, who stated that her brother-in-law was Marion Payne, one of the police officers who would testify at the trial. Upon further questioning by the court, she affirmed that she had not discussed the case with her brother-in-law and agreed that she would treat his testimony as she would the testimony of any other witness. With the trial court's denial of the cause challenge, Mrs. Holden was then selected for the jury, as counsel had already exhausted his peremptory challenges.
The defendant cites several cases recently decided by this Court in which a criminal juror's association with law enforcement duties was subjected to close scrutiny by the Court. State v. Madison, 345 So.2d 485 (La.1977); State v. Ballard, 337 So.2d 481 (La.1976). In the Madison case, however, the Court found that the juror's unequivocal denial that she would be influenced by the fact that her brother-in-law was a police officer was sufficient to support the trial judge's ruling that she could serve fairly and impartially. This Court has also held, however, that:
"A prospective juror's statement that he will be fair and impartial is not binding on the trial court. If the revealed details of the relationship are such that bias or prejudice may be reasonably implied, a juror may be properly refused for cause. State v. Monroe, 366 So.2d 1345 (La.1978)." State v. Lewis, 391 So.2d 1156, 1158 (La.1980).
See also, State v. McIntyre, 381 So.2d 408 (La.1980).
In the present case, Mrs. Holden's impartiality is somewhat suspect, in that her police officer brother-in-law was a witness at the pre-trial motion. However, she stated that she had never discussed the case with him.
In State v. McIntyre, supra, at 410, the Court held that:
"the mere fact that a juror is related to a participant in the case does not disqualify the juror from service. The party challenging the juror must also show that the relationship would influence the juror in arriving at a verdict. State v. Gray, 351 So.2d 448 (La.1977); State v. Jones, 345 So.2d 1157 (La.1977)."
In the present case, defendant did not attempt to question Mrs. Holden further concerning her possible bias. There is nothing, therefore, in the record which demonstrates that Mrs. Holden's verdict was affected by her relationship to her brother-in-law.
This assignment of error lacks merit.

NO. 4
Prospective juror, Sharp, testified that he knew "Nicky" and "old Brady," the defense attorneys, because he had retired from the position of warden at the jail about five years ago, after twenty years of service. Mr. Sharp was sure that his prior position would not affect his ability to give the defendant a fair and impartial trial. The defense, having exhausted its peremptory challenges, moved to exclude Mr. Sharp for cause. The trial court denied this motion.
*697 As noted above, criminal jury service by one associated with law enforcement duties must be closely scrutinized. State v. Ballard, supra; State v. Madison, supra; State v. Lewis, supra. Indeed, this Court has expressly held that an actively employed criminal deputy sheriff is not a competent criminal juror. State v. Simmons, 390 So.2d 1317 (La.1980). In the present case, however, Mr. Sharp had been retired for approximately five years. He stated that he would not be influenced by his acquaintance with the defendant's counsel or by his previous position as prison warden. The defendant failed to demonstrate that Mr. Sharp's relationship with defense counsel would influence his verdict, State v. McIntyre, supra, or that as a prior law enforcement officer, he was prejudiced against the defendant.
This assignment of error lacks merit.
ASSIGNMENTS OF ERROR NOS. 5 AND 17
By these assignments of error, the defendant argues that the trial court erred by permitting the prosecutor to draw a diagram during the trial to assist him in his direct examination of Police Chief Tyrney and by allowing the subsequent admission of that diagram into evidence as State Exhibit No. 14.
The defendant appears to be advancing two theories of error relative to the fact that the prosecutor personally drew the diagram in court before the jury; the contemporaneous objection made in the trial court argued that the prosecutor was thereby leading the witness, and, if a diagram was to be created in order to facilitate Chief Tyrney's testimony, then the chief should draw it himself.
The prosecutor's response to this objection at trial was that he had only "drawn some lines which proximated streets." He then elicited from Chief Tyrney the names of the streets and the location of the victim's home and Walter White's home, having offered to let Chief Tyrney draw new lines from scratch.
The extent to which the witness' testimony was led by the prosecutor's drawing of lines to represent streets appears negligible. A leading question is "one which suggests to the witness the answer he is to deliver." State v. Murray, 375 So.2d 80, 83 (La.1979). In the present case, it does not appear that by drawing lines to represent streets, the prosecutor suggested to the witness any particular street name designations or the location of the victim's home.
In any case, this Court has held that "a verdict should not be reversed in the absence of a clear abuse calculated to prejudice the accused's rights." State v. Swift, 363 So.2d 499, 505 (La.1978). No such abuse has been demonstrated here.
In further support of his claim that the prosecutor's drawing was inadmissible, the defendant maintains in brief that the diagram was offered as an accurate representation of the location of the crime despite the fact that it was not made by a draftsman, or made to scale.
The diagram was offered into evidence at the close of the state's case in chief. The state did not represent that the drawing was an accurate diagram of the area, but merely offered it to show the relative locations of various key spots involved in this crime. Such evidence has been held to be admissible by this Court, which has pointed out that:
"In Louisiana the rule concerning the introduction of demonstrative evidence is that the foundation laid must establish that it is more probable than not that the evidence is connected with the case and that the evidence has some relevance which the trial court considers sufficient to warrant its introduction. State v. Drew, 360 So.2d 500, 518-19 (La.1978)" State v. Andrews, 369 So.2d 1049, 1050-51 (La.1979).
In State v. Lawrence, 365 So.2d 1356, 1358 (La.1978), the Court pointed out that:
"The lack of skill as a draftsman and the inaccuracies of the drawing go to the weight to be accorded to the sketch but do not defeat its admissibility."
*698 Similarly, in this case, the defendant had the opportunity, on cross-examination of Chief Tyrney, to point out to the jury any inaccuracies in the diagram.
These assignments of error lack merit.
ASSIGNMENTS OF ERROR NOS. 6, 11 AND 12
By these assignments of error, the defendant maintains that the trial court erred in allowing the State to refer to, and subsequently to present, the testimony of Walter White, without giving notice of its intent to do so prior to trial, or during opening statement.
Walter White testified that he was returning from a night of bar-hopping at 2:20 a. m. on June 3, 1979, when he saw the defendant's car drive past him headed towards (or away fromthe testimony is conflicting) the victim's home.
The defendant argues that this testimony took him completely by surprise during the trial and severely prejudiced his case. He presents two arguments in support of his contention that the trial court should have excluded Walter White's testimony.
Initially, the defendant points out that the State did not include any reference to Walter White, or the substance of his testimony, in its opening statement. The defendant refers to La.C.Cr.P. Art. 769, which reads:
"Evidence not fairly within the scope of the opening statement of the state shall not be admitted in evidence.
If the state offers evidence that was inadvertently and in good faith omitted from the opening statement, the court, in its discretion may admit the evidence if it finds that the defendant is not taken by surprise or prejudiced in the preparation of his defense."
As the defendant concedes, it is well established that the State's evidence need not be detailed in the opening statement.
"The statement's primary function is to set forth in general terms the nature of the charge and of the evidence sufficiently to enable the jury to follow the proceedings and to inform the accused of what acts on his part the state intends to prove. La.Code Crim.P. arts. 766, 769; State v. Robertson, No. 60,909, 358 So.2d 931 (La., April 10, 1978); State v. Sneed, 316 So.2d 372 (La.1975)." State v. Drew, 360 So.2d 500, 519-520 (La.1978).
The present State opening made it clear that the State intended to prove that the defendant had used his car to go to the victim's home. The evidence offered proves only that the defendant was seen in his car, at the appropriate time, by a disinterested observer, an occurrence not inconsistent with the acts of the defendant outlined in the State's opening.
Next, the defendant argues that the State's failure to provide pre-trial notice of its intent to call Walter White was a violation of La.C.Cr.P. Art. 727(B), which reads in pertinent part as follows:
"A. Upon written demand of the district attorney stating the time, date, and place at which the alleged offense was committed, the defendant shall serve within ten days, or at such different time as the court may direct, upon the district attorney a written notice of his intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom he intends to rely to establish such alibi.
B. Within ten days thereafter, but in no event less than ten days before trial, unless the court otherwise directs, the district attorney shall serve upon the defendant or his attorney a written notice stating the names and addresses of the witnesses upon whom the state intends to rely to establish the defendant's presence at the scene of the alleged offense and any other witnesses to be relied on to rebut testimony of any of the defendant's alibi witnesses."
Counsel points out that he had voluntarily served the district attorney with written notice of the defendant's alibi. He urges this Court to hold that when a defendant *699 has, on his own initiative, submitted a notice of alibi to the State, that Section B of Art. 727 requires the State to reciprocate by providing defendant with the names of any witnesses to be used by the State to establish the defendant's presence at the scene of the crime.
The State argues that where notice of defendant's alibi is not voluntarily provided, Article 727 has not been utilized by the State, which therefore has no duty, pursuant to that Article, to serve defendant with notice of the witnesses who would be called to rebut the alibi defense.
This Article was passed by the legislature and became effective in 1977. This Court does not appear to have ever been presented with this question previously. In State v. Williams, 392 So.2d 619 (La.1980) and State v. Bias, 393 So.2d 677 (La.1981), this Court faced the problem of the defendant's failure to respond to the State's request for notice of alibi. The Williams court pointed out that the purpose in providing discovery in this area is to prevent surprise and delay at the trial level.
Under a strict reading of Article 727, it does not appear that the State is obligated to respond with production of its alibi rebuttal witnesses unless it has received, upon its own request, the defendant's notice of alibi. This Article was not intended to provide the defendant with a means whereby it could force the State's disclosure of the witnesses which could refute the defendant's alibi.
These assignments of error lack merit.
ASSIGNMENT OF ERROR NO. 7
By this assignment of error, the defendant reurges the argument presented to this Court in his prior application for writ of certiorari. State v. Chapman, 381 So.2d 1239 (La.1980), denied March 28, 1980. The defendant maintains that the trial court erred in denying his motion to suppress the evidence seized pursuant to the warrantless search of his home on the night of the rape.
At the hearing on the Motion to Suppress the Evidence, held January 7, 1980, the State presented the testimony of the police officers who were involved in the arrest of the defendant at his home at approximately 3:30 a. m. on June 3, 1979.
Chief of Police Leon Tyrney testified that immediately upon receiving from the victim a description of her assailant, he sent Officer Badon to pick up the defendant because defendant matched that description. Officer Badon's knocking at the door of defendant's mobile home elicited no response, but he felt the hood of the defendant's car and it was warm. Chief Tyrney and two other officers arrived within fifteen minutes and at that time, the defendant's wife opened the door. She told them that her husband had recently arrived home and upon their request, she allowed them to enter in order to speak to the defendant. She led them into the bedroom where the defendant was lying in the bed. They immediately observed bloodstained clothing on the floor and observed that the defendant had cuts on his shoulder and back.
Chief Tyrney testified that the defendant was not arrested at that time, but rather, agreed voluntarily to accompany the police. Nevertheless, the defendant was advised of his Miranda rights and the clothing was seized at that point.
It is well established that a search conducted without a valid warrant is per se unreasonable, and that there are only a few specifically established and well delineated exceptions to this rule. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The burden is on the State to show that a warrantless search was justified by one of these exceptions to the warrant requirement. State v. Franklin, 353 So.2d 1315 (La.1977). The State argues that the plain view exception is applicable to the present case.
In State v. Pomes, 376 So.2d 133 (La. 1979), this Court held that evidence may be lawfully seized as being in plain view if the following requisites are met:
(1) there must be a prior justification for police intrusion into the protected area;
(2) the evidence must have been discovered inadvertently; and
*700 (3) it must be immediately apparent, without close inspection, that the items seized are evidence or contraband.
The police intrusion into the defendant's home in the present case is sought to be justified by the consent given by the defendant's wife. This Court has held that a wife may provide such authorization. State v. Dowling, 387 So.2d 1165 (La.1980); State v. Dupuy, 319 So.2d 299 (La.1975); see also, State v. Bodley, 394 So.2d 584 (La.1981).
The defendant's wife, Sylvia Chapman, testified that after answering the door, she went back to the bedroom to wake up her husband and the police followed her inside without her consent. This testimony, however, was contradicted by the four officers involved in the investigation who were present at defendant's trailer home on the night in question. It appears, therefore, that the trial court did not abuse its discretion by finding that there had been a valid consent to enter given by the wife.
It is not denied by the defendant that the clothing seized by the police was in plain view on the floor of defendant's bedroom. Furthermore, the blood stains on the clothing, and the fact that the defendant's green shirt matched the description given by the victim, made it immediately apparent that the items were evidence of the commission of the crime.
Thus, it appears that the evidence seized falls within the plain view exception and was, therefore, lawfully seized by the police and properly admitted into evidence by the trial court.
This assignment of error lacks merit.
ASSIGNMENTS OF ERROR NOS. 8 AND 24
By these assignments of error, the defendant argues that the trial court erred in overruling his objections to allegedly leading questions posed by the district attorney. In view of the large discretion afforded to the trial court concerning the examination of witnesses, State v. Murray, 375 So.2d 80 (La.1979), these assignments of error lack merit.
ASSIGNMENT OF ERROR NO. 9
This assignment of error urges that the trial court erred in denying the defendant's motion for a new trial on the basis of newly discovered evidence.
The defendant's motion for a new trial included an affidavit by Ruth von Unwerth, a nurse who was present when the victim identified the defendant in the hospital. This affidavit states that prior to being shown the defendant, the victim was informed by Spike Tierney, "We've got that black son of a bitch out here. We want you to identify him for us." The defendant was then shown to the victim who initially said, "Yes", but subsequently said, "Oh, I'm not sure. I can't be sure, I'm so confused." She was distraught, crying and wringing her hands.
The nurse who witnessed these actions contacted defense counsel after she had read about the contrary testimony presented at the defendant's trial.
Defendant maintains that all reasonable diligence was exercised prior to trial, in that appropriate discovery motions were filed. The State admits that it did not know that Nurse von Unwerth was present during the identification, but argues that the defendant could have discovered this testimony prior to trial if due diligence had been exercised. Nevertheless, defendant's extensive trial presentation of lay and expert witnesses' testimony has demonstrated that since all possible diligence was exercised, the State's argument to the contrary is without substance.
More persuasive, however, is the State's contention that even if this evidence had been presented to the jury, the verdict would probably not have been different.
La.C.Cr.P. Art. 851 reads in pertinent part:
"The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion *701 shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty;"
This Court has frequently held that the test of whether a new trial should be granted to the defendant is whether the new evidence is so material that it ought to produce a different result than the verdict reached. State v. Bagley, 378 So.2d 1356 (La.1979); State v. Williams, 362 So.2d 530 (La.1978).
The defendant points out that the eyewitness identification of the defendant by the victim was crucial to the State's prosecution. However, even if it is assumed that all of Nurse von Unwerth's affidavit statements are accurate and a jury would discount, somewhat, the strength of the victim's identification, there was, nevertheless, other evidence presented which supported the defendant's conviction: for example, the defendant's blood stained clothing and recently driven car; the observation of the defendant driving towards the area of the victim's home at 2:20 on the morning of the rape; and the defendant's hospital-type shirt and his overall appearance. This is not a case based exclusively upon the victim's identification and, therefore, a new witness whose testimony might cast some doubt upon the veracity of that identification cannot be considered "so material that it ought to produce a different result than the verdict reached." State v. Williams, supra, at 535.
This assignment of error lacks merit.
ASSIGNMENT OF ERROR NO. 10
By this assignment of error, the defendant asserts that the trial court erred in permitting the State to question the victim concerning the odor of alcohol on her assailant. The State concedes that this question exceeded the subject matter of the defense cross-examination.
La.R.S. 15:281 provides:
"The redirect examination must be confined to the subject matter of the cross-examination and to the explanation of statements elicited on cross-examination; but the application of this rule is within the discretion of the trial judge, provided that the opportunity be not denied to recross on the new matter brought out on the redirect."
This Court has held that where the defendant is allowed the opportunity to recross the witness on the new subject brought out by the State during redirect, there has been no error. State v. Drew, 360 So.2d 500 (La.1978). In the present case, the trial court offered the defendant such opportunity, which he utilized fully. The defendant has failed to demonstrate that he suffered any prejudice due to this trial court ruling. La.C.Cr.P. Art. 920.
This assignment of error lacks merit.
ASSIGNMENT OF ERROR NO. 13
By this assignment of error, the defendant objects to the trial court's restriction of his cross-examination of Dr. Rodwig.
Dr. Rodwig, a gynecologist, examined the victim at the hospital following the rape. He testified at trial concerning his examination findings, concluding with his expert opinion that the victim had been raped. On cross-examination, the defendant questioned Dr. Rodwig concerning the emotional condition of the victim. Specifically, defendant asked the doctor whether she had been too distraught to make an accurate identification of the defendant. When the doctor replied in the negative, defendant asked the following questions and the trial court sustained the State's objections:
"Do you feel that the identification may have been somewhat prejudicial to Mr. Chapman?"
"Doctor, do you remember telling me when I interviewed you last week that you would have hated like hell to have *702 been brought in like Vernon was for identification?"
The defendant urges that La.R.S. 15:280 allows cross-examination of any witness upon the whole case. He cites cases in which this Court has reaffirmed an accused's right to confrontation, State v. Giordano, 259 La. 155, 249 So.2d 558 (La.1971), and also cites cases which have strongly held that the largest possible scope of cross-examination is permitted for impeachment in the interest of exposing bias or interest of the witness. State v. Senegal, 316 So.2d 124 (La.1975).
In the present case, however, the defendant's disallowed questions were not probative of the credibility or bias of Dr. Rodwig. The questions sought to elicit this gynecologist's opinion concerning the mental state of the victim. Such an inquiry fell outside the doctor's field of expertise, and the trial court did not abuse its wide discretion and control by ruling that these questions were not proper. This assignment of error lacks merit.
ASSIGNMENTS OF ERROR NOS. 14 AND 16
These assignments of error urge that the trial court erred in its limitation of the testimony of Robert Buckout, Ph.D., who was called by the defendant as an expert in the field of eyewitness identification. This psychologist has researched and published extensively and has tested over 8000 subjects. His expertise was stipulated to by the State and the trial court allowed over forty pages of direct examination by the defendant.
Despite the fact that the trial court allowed such extensive presentation of the work of this expert witness, the defendant argues that he was prejudiced by the Court's decision not to allow Dr. Buckout to supplement his testimony through the presentation of slides.
La.R.S. 15:275 vests the trial judge with "a sound discretion to stop the prolonged, unnecessary and irrelevant examination of a witness." This has been restated by the court on numerous occasions. State v. Kenner, 384 So.2d 413 (La.1980); State v. Taylor, 347 So.2d 172 (La.1977). The Court has held that a conviction will not be reversed due to the trial judge's control of the witness examination unless an abuse of discretion is shown. State v. Murray, 375 So.2d 80 (La.1979); State v. Kaufman, 331 So.2d 16, cert. den. 429 U.S. 981, 97 S.Ct. 495, 50 L.Ed.2d 591 (La.1976).
No such abuse has been demonstrated in the present case where the defendant has not even been able to show how he was prejudiced in view of the extensive testimony from Dr. Buckout which was allowed.
These assignments of error lack merit.
ASSIGNMENT OF ERROR NO. 15
Defendant asserted for the first time in his motion for a new trial that the State used its peremptory challenges to unconstitutionally exclude all blacks from the defendant's jury. The defendant does not list the black jurors so excluded; however, the State concedes that there were no black jurors sworn although some blacks were called on voir dire. The defendant maintains that all of the blacks called were excused by the State and this is the only proof which can be offered by a defendant to establish a prima facie case of discrimination.
When a defendant contends that he as been deprived of a jury which represents a fair cross-section of the community, he has the burden of establishing a prima facie case of discrimination. State v. Brown, 371 So.2d 751 (La.1979). Furthermore, this Court has consistently adhered to the Supreme Court holding in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), stating that a showing of systematic exclusion over a period of time is required to establish a violation of equal protection under the Fourteenth Amendment. State v. Prejean, 379 So.2d 240 (La.1979).
This defendant argues that the burden defined by the Brown case, supra, is virtually impossible for a single defendant to carry due to the fact that he is only before the court on one occasion and is therefore unable *703 to prove that the absence of blacks on his jury was not mere coincidence.
This argument may be well founded, however, it does not present any new issues to this Court which has been faced with similar arguments in the past and has firmly adhered to the Swain test requiring that defendant demonstrate a systematic exclusion over a period of time.
In any case, the present defendant has not only failed to demonstrate any historic pattern of discrimination, he has likewise been unable to demonstrate discrimination in the jury selection procedure used in this particular case. In fact, the State alleges that the defendant himself was responsible for the peremptory challenge of some of the black members of the venire. None of these allegations and counter-allegations can be supported by the record, because there is no indication of the race of the persons called for voir dire from the petit jury venire.
This assignment of error, therefore, lacks merit.
ASSIGNMENT OF ERROR NO. 18
By this assignment of error, the defendant argues that the trial court erred in sustaining the State's objection to a question posed by defendant on re-direct to Percy Charles Brown. Mr. Brown testified concerning the defendant's good reputation in the community for truthfulness and for leading a quiet family life. On cross-examination, this witness admitted that he was willing to do anything he could to help defendant. When defendant questioned Mr. Brown on re-direct, he asked:
"Mr. Brown, would you tell a lie for Mr. Chapman?"
The State objected that this question exceeded the scope of proper re-direct in that it went outside the subject matter of the cross-examination. The trial court sustained the objection without giving reasons.
It appears that the disallowed question was merely an attempt to rehabilitate the witness, to show that he would not do anything for the defendant, specifically he would not lie for him. The question may not, therefore, have been outside the proper scope of the redirect examination. La.R.S. 15:281. In any case, the trial court has great discretion in controlling the redirect examination of witnesses which will not be overturned on appeal absent an abuse. State v. Anthony, 332 So.2d 214 (La.1976).
In the present case, the witness answered the question despite the State's objection. Defendant, therefore, cannot be said to have suffered any prejudice.
This assignment of error lacks merit.
ASSIGNMENT OF ERROR NO. 19
By this assignment of error, defendant contends that the trial court erred in refusing to admit into evidence a particular FBI pamphlet entitled "Examination of Biological Fluids." This evidence was offered in connection with the testimony of Sarah Williams, forensic serologist from the Dallas County Southwestern Institute of Forensic Sciences, called by defendant as an expert in that field. Defendant offered this pamphlet in order to aid the jury's deliberations on the reliability of the blood tests performed by the State. The offer was not permitted by the trial court.
Assuming this FBI pamphlet satisfies the "learned treatise" requisite for admissibility, this Court may, nevertheless, determine that its content was not relevant in the present case. It was not offered to show the inaccuracy of the tests performed by the State, but rather, to establish that further testing could have been done. Ms. Williams, defendant's expert, had already testified fully on this point. The trial judge is vested with wide discretion in regard to the relevancy of evidence and his ruling should not be disturbed in the absence of a clear showing of abuse. State v. Walker, 344 So.2d 990 (La.1977). In view of the cumulative nature of the pamphlet, and its secondary relevance to the issue of the accuracy of the State's tests that were performed, this assignment of error lacks merit.
*704 ASSIGNMENTS OF ERROR NOS. 20, 21 AND 22
By these assignments of error, defendant maintains that the trial court erred in refusing to allow certain testimony by Ms. Williams, the forensic serologist expert called by defendant. The trial court refused to permit Ms. Williams to give an opinion concerning the absence of defendant's blood-type from the victim's bedspread, or concerning the absence of the victim's blood-type from defendant's underwear.
The State argued that these conclusions were outside that witness' area of expertise. The trial court retired the jury and allowed defense counsel the opportunity to lay a predicate demonstrating Ms. Williams' expertise in the area of absence of bloodstains, i.e., the reconstruction of crimes.
Ms. Williams merely testified that she was trained in the analysis of patterns of blood and the analysis of the location of blood. The trial court, therefore, ruled that she was not qualified to render an opinion on the significance to be derived from the absence of blood on any particular piece of evidence.
This Court has repeatedly held that the trial judge has wide discretion in the area of the qualifications of an expert witness, and such discretion will not be disturbed on appeal in the absence of manifest error. State v. Hill, 332 So.2d 475 (La.1976); State v. Ledet, 298 So.2d 761 (La.1974).
In the present case, the judge's rulings that the questions sought to be asked by defendant involved opinions outside Ms. Williams' area of expertise appears to be supported by the transcript and the jurisprudence.
These assignments of error lack merit.
ASSIGNMENT OF ERROR NO. 23
By this assignment of error, defendant argues that the trial court erred in allowing State expert, Shirley Phillips, to testify concerning the opinion of Mr. Wraxall, another expert in her field.
In State v. Chalaire, 251 La. 984, 207 So.2d 767 (1968), the Court found that:
"The authorities are in agreement that the opinion of an expert, however qualified, cannot be predicated upon the opinions and conclusions of others. Lewis v. Commonwealth, 332 S.W.2d 656 (Ky. 1960); Watts v. State, 223 Md. 268, 164 A.2d 334 (1960); State v. David, 222 N.C. 242, 22 S.E.2d 633 (1942); State v. King, 158 S.C. 251, 155 S.E. 409 (1930); 2 Underhill's Criminal Evidence # 312 (5th ed. 1956); 2 Wharton's Criminal Evidence # 522 (12 ed. 1955); Green, Proof of Mental Incompetence and the Unexpressed Major Premise, 53 Yale L.Jo. 271, 282 (1953); 32 C.J.S. Evidence § 551; 20 Am.Jr. Evidence § 791."
Thus, it would appear that an expert witness may not testify as to the opinions of another expert in the same field. By allowing such testimony, the trial court, in the present case, erred; nevertheless, this Court concludes that the error does not warrant reversal because it did not affect the substantial rights of the accused. La.C.Cr.P. Art. 921. It does not appear likely that Ms. Phillips' testimony concerning Mr. Wraxall's opinion on glove use by lab technicians could have had a "substantial impact" upon the jury. State v. Boyd, 359 So.2d 931 (La.1978).
This assignment of error lacks merit.
ASSIGNMENT OF ERROR NO. 25
By this assignment of error, defendant argues that the trial court erred in allowing Dr. Scrignar, a physician specializing in the field of psychiatry, to testify as to the victim's reaction to stress.
Dr. Scrignar was called by the State to rebut the testimony presented by Dr. Buckout concerning the decreased perceptual abilities of persons undergoing severe stress. Dr. Scrignar testified concerning the normal bodily reactions to stress and concluded that the average person's physical reaction to stress produced "a hyper-awareness state" where the senses were sharpened and awareness increased. Defendant objected when the Court allowed Dr. Scrignar to state his opinion that the victim was such an average person. This *705 testimony implied that the victim's senses were sharpened during the rape and, therefore, her subsequent identification was likely to have been accurate.
Dr. Scrignar had examined the victim only once, on January 7, 1980, six months after the rape. Prior to the above testimony, the trial court ruled that the doctor could not testify concerning the mental state of the victim on January 7, 1980. Further, the judge specifically ruled that the doctor could not testify concerning the lack of mental abnormality found in the victim. The doctor was only to be questioned concerning stress response in general.
Defendant contends that the trial court's modification of this initial ruling, so as to allow the doctor to testify that the victim's reactions to stress was average, created confusion which prejudiced defendant. Furthermore, defendant argues that despite this subsequent decision by the trial court, apparently allowing the doctor to testify concerning the victim's condition as he found it on January 7, 1980, (i.e., average), the defendant was not permitted, on cross-examination, to question the doctor concerning the victim's vision. According to defendant, this curtailment of his questioning was unfairly prejudicial.
Doctor Scrignar is a psychiatrist; therefore, he may not be competent to give an expert opinion concerning the victim's vision. In the absence of a clear showing of abuse, the trial court's wide discretion in determining the competency of an expert will not be disturbed on appeal. State v. Carter, 363 So.2d 893 (La.1978).
The jurisprudence of this Court appears to allow Dr. Scrignar's testimony concerning the victim's average reaction to stress, despite the fact that his only examination of the victim took place more than six months after the rape. In State v. Watley, 301 So.2d 332 (La.1974), the Court held that similarly obtained medical testimony affected the weight to be accorded the expert's opinion, rather than the admissibility of the testimony.
In the present case, the trial court's initial decision not to admit the testimony was partially modified during the course of the direct examination of the expert. Defendant cannot demonstrate how this modification has prejudiced him.
This assignment of error lacks merit.
ASSIGNMENTS OF ERROR NOS. 26 AND 27
These assignments of error maintain that the trial court erred in failing to admonish the jury to disregard two inaccurate and, if intentional, improper statements made by the prosecutor during closing argument.
The first of these statements was clearly a slip of the tongue and defense counsel acknowledges that. The prosecutor made the following misstatement:
"Vernon Chapman first pleaded guilty... not guilty by reason of insanity."
The transcript reflects that the prosecutor immediately caught the mistake and corrected it. Defense counsel immediately objected, pointing out the slip of the tongue and requesting the judge to admonish the jury to disregard it, saying, "There has never, ever been entered a plea of guilty in this case." The prosecutor attempted to clarify her misstatement, whereupon the trial court indicated that she should proceed with her closing. Although defendant did not receive a formal admonishment, it was made clear to the jury that the brief reference to a guilty plea had been merely a mistake.
The second objection was raised by defendant when the prosecutor, during rebuttal closing argument, made the following observations concerning the trial testimony of defendant:
"Why does he have to tell you that the officers brought him back to the house, back around inside the fence and up close? Because at the time he first testified, he didn't know what we had from the standpoint of physical evidence. He didn't know but what there was glass on his shoes. He didn't know but what there was fingerprints. So he has to make up this story. But you heard officers *706 who have no interest in this case other than doing their job tell you, `We didn't take him back in there. We did take his shoes there.' But I haven't offered his shoes in evidence. I am not trying to tell you we found glass there on his shoes. But he has to come up with a story because, my goodness, if they say my fingerprints were there, then my goose is cooked. So he has to come up with a story."
Defendant had testified that following his arrest, he was driven to the victim's house and led up to the broken porch window, although the police claimed they never took him past the gate. Defendant's hands, which had been cuffed in front, were then re-cuffed behind him. Presumably this was done in order to present defendant to the victim in a less incriminating posture. Defendant, however, testified that he suspected that the police hoped to be able to push his hands up against some object to leave incriminating fingerprints at the crime scene. In order to prevent this, he kept his fists tightly closed.
Defendant argued to the trial court and argues again in his brief, that defendant did know, prior to his trial testimony, exactly what physical evidence the State had to offer as disclosed by the State's answer to defendant's Prayer for Oyer. Defendant requested the trial court to instruct the jury that the prosecutor had misstated the facts in that regard and further requested that the jury be furnished with a copy of the record "so they can check the dates of the Prayer for Oyer."
The trial court overruled defendant's objection but gave the following admonishment to the jury:
"I would instruct the jury that they're to disregard anything that they didn't to any evidence that wasn't heard in this courtroom, as I'm going to give you instructions. But as far as the other things, Mr. Barranger, I'm going to overrule your objection. Go ahead."
This instruction, of course, does not relate specifically to the defendant's objection.
Because La.C.Cr.P. Art. 774, defining the scope of argument, provides no sanction for a violation, the proper remedy is found in Arts. 770 and 771. State v. Lee, 340 So.2d 180 (La.1976); see also, La.C.Cr.P. Art. 774, Official Revision Comment (c).
La.C.Cr.P. Art. 771 provides that the trial court shall promptly admonish the jury to disregard a remark or comment made by the district attorney in argument, within the hearing of the jury, when the remark is irrelevant or immaterial and of such nature that it might create prejudice, although not prejudice within the scope of Article 770.
In the present case, the trial court's failure to admonish the jury, as per defendant's request, may have, in the second instance, left the jury with the impression that defendant's objection was without merit. A typical jury is unlikely to know what a Prayer for Oyer involves, and therefore this jury probably continued to believe as the prosecutor had told them: that the defendant had no pre-trial notice of the State's evidence against him and that is why he testified that he had been taken by police back to the victim's house.
The judge has wide discretion in confining the arguments to the scope of the evidence. State v. Lee, 340 So.2d 180 (La. 1976); State v. Dorsey, 262 La. 785, 264 So.2d 644 (La.1972). This Court has repeatedly held that it will not set aside a verdict on the basis of improper argument, unless it is thoroughly convinced that the jury is influenced by the remarks and that the remarks contributed to the verdict. State v. Simms, 381 So.2d 472 (La.1980); State v. Williams, 373 So.2d 1278 (La.1979). Although the State's comments as to the facts were incorrect, defendant was not prejudiced thereby.
These assignments of error, therefore, are without merit.
ASSIGNMENT OF ERROR NO. 28
By this assignment of error, defendant argues that the trial court erred in refusing to give the jury a requested special charge, although it did not require qualification, limitation, or explanation and it was *707 wholly correct and pertinent. La.C.Cr.P. Art. 807.
The requested jury charge contained instructions concerning the elements of the crime of forcible rape and the jury's duty to acquit under the reasonable doubt standard of innocence.
La.C.Cr.P. Art. 807 states that a requested special charge need not be given if it is included in the general jury charge. In the present case, the trial court's general charge covered reasonable doubt and discussed the elements of the crime charged, aggravated rape, as well as the element of every lesser included offense, specifically, forcible rape.
This assignment of error lacks merit.
ASSIGNMENTS OF ERROR NOS. 29 AND 31
By these assignments of error, defendant argues that the trial court erred in failing to give to the jury certain charges which were contained in the copy of the Court's general charge submitted to counsel prior to the filing by counsel of requested special charges. Defendant maintains that because he expected that these charges would be included in the general charge, he did not specially request them and was, therefore, prejudiced when these charges were omitted from the Court's general charge.
Defendant points out that the general charge contained a section on the failure of defendant to produce evidence or testify, which the trial court omitted. In view of the fact that defendant in the present case did testify and did present evidence, this charge was not relevant and its omission was proper and created no prejudice to defendant. La.C.Cr.P. Art. 920.
Defendant also notes that the trial judge's prepared jury charges contained instructions concerning the penalty allowed by law for aggravated rape and each of the lesser included offenses. These prepared instructions included the information that a conviction of aggravated rape carries a mandatory penalty of life imprisonment without benefit of probation, parole or suspension of sentence. LSA-R.S. 14:42. During the actual instruction of the jury, no reference was made to the type of punishment which defendant could receive for the charged or any of the included offenses. Defendant objected to this failure immediately upon the retirement of the jury.
In the present case, defense counsel had received a copy of the trial court's proposed charge and it was only when the charge was fully delivered that counsel for defendant objected. Defendant points out that he would have specially requested a charge on the mandatory penalty had it not been contained in the trial court's proposed general charge.
We cannot agree with this contention. Counsel for defendant had two opportunities to insure that the mandatory penalty for aggravated rape was described by the Court to the jury. LSA-C.Cr.P. Art. 801 provides that, if requested prior to the swearing of the first witness, the trial judge must provide a copy of his written charge to counsel and shall read it to the jury. Nothing in the record shows that such a request was made.
LSA-C.Cr.P. Art. 807 provides that, prior to argument, counsel may submit special written charges for the jury. Counsel for defendant failed to so submit a special charge describing the mandatory penalty for aggravated rape. The case of State v. Washington, 367 So.2d 4 (La.1978), which held that, on request, a trial judge must describe and must permit counsel to argue the mandatory penalty to the jury, is, therefore, not in point. Furthermore, it is significant to note that the record reflects that defense counsel did not argue the issue of the mandatory penalty in his closing argument to the jury.
Defense counsel's failure to either timely request the trial court's written general charge or to timely provide his own special charge renders nugatory his objection to the charge as given.
These assignments of error lack merit.
*708 ASSIGNMENT OF ERROR NO. 30.
By this assignment of error, defendant maintains that the trial judge erred by inadvertently substituting the word "act" in place of the word "rape" in the following portion of the jury charge defining the lesser included offense of simple rape.
"Simple rape is ... or simple rape is... or simple act is the act of vaginal sexual intercourse with a female who is not the spouse of the defendant..."
The defendant objected immediately following the jury's retirement. He did not at that time, nor does he now, explain how this extremely minor error, even if noticed by the jury, could have prejudiced him in any way.
This assignment of error lacks merit.
ASSIGNMENT OF ERROR NO. 32
By this assignment of error, defendant asserts that the trial court erred in denying the motion for a new trial as urged on the grounds set forth in defendant's written motion. This motion reiterates several of the issues urged through assignments of error discussed above, but also raises several new arguments.
Defendant's motion stated that the verdict was contrary to the law and the evidence. In support of defendant's claim of innocence, the results of a polygraph test, passed by defendant, were attached to the new trial motion.
At the hearing on the motion for a new trial, the trial judge refused to admit the results of the polygraph examination into evidence "in view of the jurisprudence of this state." The trial court appears to have been unaware of this Court's decision in State v. Catanese, 368 So.2d 975 (La.1979), which allowed the admission of polygraph evidence at post-trial proceedings. The Catanese court, however, took care to state that such admission was within judicial discretion and subject to guidelines such as those laid down by the trial judge in that case. In the present case, no judicial guidelines had been laid down by the Court and defendant made no showing that he had complied with the Catanese guidelines for the admission of this evidence.
In any case, even if this Court gives some weight to defendant's favorable polygraph results, those results must be weighed against the evidence presented at defendant's trial. When that evidence is viewed in the light most favorable to the prosecution, it is sufficient to convince a rational trier of fact beyond a reasonable doubt that defendant committed the offense charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Such evidence includes the victim's description of the assailant, her subsequent identification of defendant, the bloodstained clothing of defendant, and the observation of defendant's car being driven near the victim's house at the time of the rape. The evidence appears to adequately support the jury's decision.
Defendant's new trial motion goes on to raise the argument that there was jury misconduct, in that the jury discussed the evidence, prior to the submission of the case. Defendant asserts that an alternate juror, Mr. Pert, related these facts to defense counsel immediately after the jury had retired.
The trial judge considered this allegation as unfounded based upon his discussion with Mr. Pert. Furthermore, La.R.S. 15:470 provides that a juror is not competent to impeach the verdict of the jury. It is clear that in order to support this allegation, the defendant would have to ask questions of the jurors that they are not permitted to answer under this statutory provision. State v. Poree, 386 So.2d 1331 (La. 1980). The trial court, therefore, correctly denied defendant's motion for a new trial on this basis.
Most importantly, defendant's motion for a new trial re-urged the argument presented in his motion to suppress the identification, which was argued on January 7, 1980, and denied by the trial court.
At trial, the victim testified that she was in the hospital following the rape when she was shown defendant and immediately recognized *709 him as her assailant. Defendant moved to suppress any such trial testimony relating to the pre-trial identification and further argued that any in-court identification would be a poisonous fruit of this initially prejudicial and suggestive confrontation.
The hospital identification occurred within two hours of the rape. The victim was at the hospital for examination by a doctor and treatment of her injuries. Following this examination, she was shown defendant, whose hands were cuffed behind his back. She identified him.
The State does not contend that this was not a one-on-one confrontation.
"One-on-one confrontation identifications are not favored. However, when a suspect is apprehended shortly after commission of an offense, a return to the scene of the crime for identification is permissible under appropriate circumstances. State v. Dunbar, 356 So.2d 956 (La., 1978). A prompt confrontation can promote fairness `by assuring reliability and the expeditious release of innocent suspects.' State v. Maduell, 326 So.2d 820 at 825 (La.)." State v. Kenner, 384 So.2d 413, 416 (La.1980).
See also State v. Kelly, 362 So.2d 1071 (La. 1978).
In this case, the confrontation did not take place at the scene of the crime, yet arguably the same reasoning could be applied to the hospital identification which took place very shortly after the rape.
This Court has held that:
"Even if an identification procedure is suggestive, an identification is admissible if the totality of the circumstances demonstrate that the identification was reliable. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); State v. Guillot, supra [353 So.2d 1005 (La.1977)]. The likelihood of misidentification violates due process, not merely the suggestive procedure. Manson v. Brathwaite, supra; State v. Guillot, supra. Factors to be considered in determining the reliability of an identification include:
`... the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.'" State v. Davis, 385 So.2d 193, 199 (La.1980).
An application of this analysis to the facts of the instant case results in a conclusion that there is not a substantial likelihood of mis-identification. 1) The rape victim first observed the perpetrator on her well-lit front porch; 2) her attention was unlikely to have been focused upon anything else at that time; 3) her prior description accurately fit defendant; 4) the level of certainty she displayed at the confrontation is the subject of dispute; 5) there was very little time between her assault and her identification of defendant.
In view of these facts, it does not appear that the trial court committed reversible error in admitting the testimony concerning the victim's pre-trial identification of defendant.
The in-court identification was also admissible because it had a source independent of any allegedly suggestive out-of-court identification. State v. Davis, 385 So.2d 193 (La.1980); State v. Kelly, 362 So.2d 1071 (La.1978).
It appears, therefore, that the trial court correctly denied defendant's motion to suppress the identification and his subsequent motion for a new trial.
This assignment of error lacks merit.
ASSIGNMENT OF ERROR NO. 33
The defendant has requested that this court review the record in this matter for errors patent on the face of the record. There are none.
This assignment of error lacks merit.
For the foregoing reasons, the conviction and sentence of defendant are affirmed.
AFFIRMED.
DIXON, C. J., dissents.

*710 ON REHEARING
DIXON, Chief Justice.
Defendant's application for rehearing was granted to consider, principally, two assignments. The first assignment concerned the denial of defendant's challenge for cause of the juror Sid Sharp, a former warden of the St. Tammany Parish Jail; the second assignment was based on the denial of the motion for a new trial after newly discovered evidence.
After further consideration, we conclude that the issues do not call for a reversal and a new trial; the conviction is affirmed.
After the defendant had exhausted all his peremptory challenges, the name of venireman Sid Sharp was drawn. Sixty-one-year-old Sharp had been warden of the St. Tammany Parish Jail for about twenty years, and had been retired for four or five years before the trial. He was well acquainted with the two defense lawyers, and referred to them by their nicknames. He did not know the defendant, nor either of the prosecutors, nor the victim; he had not read about the case. On examination by defense counsel, he expressed a belief in the presumption of innocence, understood the burden of proof and reasonable doubt, and promised to withhold an opinion on the case until he went into the jury room.
The judge disallowed the challenge for cause. The only basis for the challenge was Mr. Sharp's previous employment as warden of the St. Tammany Parish Jail, his presumed acquaintance with police officers who would testify in this case, and the previous rulings of this court[1] which have held that law enforcement officers, assistant district attorneys and investigators for law enforcement agencies, by the very nature of their employment, are likely to be affected in their judgment by the employment relationship.
Except for an assumption that the jailer for many years would know personally, and be on a friendly relationship with most law enforcement officers, there is nothing in the record, nor in the nature of the position as jailer of a parish jail known generally, which would, by that fact alone, *711 disqualify such a person from service on a jury. A jailer is a custodian and an administrator. He is not active in the competitive business of law enforcement. It is possible that his position might have produced such relationships as would disqualify him in a particular case or attitudes which would disqualify him as a juror, generally, but the experience as a jailer is not one which can be expected to destroy an otherwise impartial attitude of the prospective juror. Such disqualification must be brought out on the voir dire, and must be shown by the record.
We do not mean to indicate that one who is employed by the sheriff, or the parish as a jailer when he is drawn to serve as a juror should not be disqualified. The effect of his current employment can easily be understood to influence his decision. Here, the prospective juror had been retired for four or five years, after twenty years service. No current relationship with law enforcement agencies appears. We cannot say that the effect of the twenty year period as a jailer would destroy the impartiality expected of a juror.
For these reasons, we again find no merit in this assignment.
After the verdict, defendant filed a motion for a new trial based on several grounds.[2]
There was no evidence taken on the motion for a new trial. Defense counsel had attached an affidavit,[3] however, to his *712 motion, and the motion was argued before the judge. Ruth von Unwerth learned of defendant's conviction, and, for the first time, communicated with defense counsel. She stated that she was a nurse in the emergency room of the hospital where the victim was taken after the rape, and witnessed the first identification of defendant by the victim. She described the scene and the victim's condition, and related that the victim was told by Officer Spike Kearney, in coarse language seasoned with epithets, that they had her assailant and wanted her to identify him. The curtains to the cubicle were drawn back and Vernon Chapman was presented to the victim in handcuffs. The victim glanced at the defendant for a split second and said "yes." The victim was distraught and said over and over, "Oh, I'm not sure. I'm not sure. I can't be sure. I'm so confused!"
C.Cr.P. 858 provides that review of the granting or the refusal to grant a new trial, except for error of law, is not available. C.Cr.P. 851 provides that the trial court should grant a new trial because of newly discovered evidence if the evidence, introduced at the trial "would probably have changed the verdict or judgment of guilty." C.Cr.P. 851(3). This court has frequently held that a new trial should be granted when the new evidence is so material that it ought to produce a result different from the verdict reached.
It is sometimes said that this court should review and reverse a decision for a new trial when the trial judge has "abused his discretion."[4]
It would be difficult to conclude on the record before us that the denial of the motion for a new trial in this case was an abuse of the district judge's discretion. Nor is it any easier to say that the verdict would have been different, or should have been different, if the newly discovered evidence had been presented to the jury.
Vernon Chapman was away from home in his automobile, visiting bars and drinking, in the area where the victim lived. His automobile, a white Barracuda with black strips, was identified in the area of the victim's home near the time of the attack by a Walter White who was the husband of defendant's second cousin. That witness was in an extremely difficult position which could be said to reinforce belief, or create doubt, in the truth of his testimony. He had been out in the early hours of the morning in an automobile with another woman, who had let him out perhaps a couple of blocks from his home. When his wife asked him how he had gotten home, he told her Vernon Chapman, her cousin, had brought him.
There was an independent basis for the victim's identification of the defendant. He awakened her with his noise in attempting an entry, crashed through her front door, seized her, carried her to a bedroom, and raped her. She was dragged back to the front door, robbed, and she followed the attacker outdoors and heard a car start and leave, presumably with her attacker. The assault occupied about twenty minutes. There was a bright light outside the victim's house. She testified that the inside was dark. All this information, however, was before the jury, and skillfully attacked by defense counsel. The victim's trial testimony was clear and apparently frank: she answered that she could not tell whether her assailant was tatooed, because it was too dark, but that she could describe his size and features because of the struggle and the sexual attack.
The victim's description to the investigating officers was sufficiently detailed for the officers to name two possible suspects. One was the brother of one of the police. A check determined that that suspect was at home, asleep in bed, and his car engine was cold. The other suspect, the defendant, was *713 also home in bed. There was testimony that his wife asked him when he got home, and he answered that he had been home only a short time. The engine of the automobile, parked near the house, was hot, the surface of the car was dry, there was dew on the grass; defendant's tire tracks were still evident through the dewy grass.
The defendant had a fresh wound in his side or back which he claimed he had received behind a nightclub where he went to vomit during his evening of drinking. The wound could have been caused by crashing through the glass jalousie of the victim's door.
Much testimony was given concerning blood types. The defendant's blood type matched type "O" blood found on the victim's bedding; the victim's blood type was "B." There was type "B" blood on defendant's pants.
The defendant had been unemployed for about two weeks because of an injury received at work. He testified that when he arrived home shortly before the police appeared, he had sexual intercourse with his six months pregnant wife and then retired. His wife did not testify.
In the absence of identification by the victim, the case against the defendant was based entirely upon circumstantial evidence, and would not exclude every other reasonable hypothesis of innocence. But there is the in-court identification of the victim based on a violent twenty minutes of sexual attack and robbery. Unless it can be said that the identification procedures employed at the hospital two hours after the rape were so suggestive as to make any identification evidence by the victim unworthy and inadmissible, the jury had a right to hear and evaluate the testimony of the victim about her identification of the defendant in court. The character of the victim as disclosed by the record and her apparent recognition of the tragic consequences of mis-identification do not permit such a finding.
Therefore, we again conclude that the newly discovered evidence, if presented to a jury, was not "so material that it ought to produce a different result" from the verdict reached. State v. Williams, 362 So.2d 530, 535 (La.1978).[5]
For these reasons, our original judgment is reinstated, and the defendant's conviction and sentence are affirmed.
CALOGERO, J., concurs and assigns reasons.
LEMMON and DENNIS, JJ., dissent and assign with reasons.
CALOGERO, Justice, concurring.
While I fully concur in the majority opinion on rehearing, I deem it advisable to comment upon the treatment afforded assignments of error No. 29 and 30 in our original opinion in this case. Those assignments are, as are all the assignments in the case, before us on this rehearing, and we have here found none of the assignments meritorious, a decision with which I agree. With respect to assignments 29 and 30, however, concerning the failure of the trial judge to instruct the jury regarding penalty, we made the determination in our original opinion that they were without merit because under La.C.Cr.P. art. 807 defense counsel might have submitted special written charges and failed to do so. We also noted that counsel, under La.C.Cr.P. art. 801, might have moved to be provided a copy of the judge's written charge. Also considered significant was the fact that counsel himself did not argue penalty in his closing argument to the jury. These reasons I do not consider to be conclusive, for, moved for or not, counsel apparently had a copy of the trial judge's typewritten proposed charge and that charge included an instruction on penalty. It was therefore unnecessary for counsel to submit a request for a special charge on this subject. Furthermore, *714 counsel might have chosen not to argue penalty in anticipation of relying exclusively on the judge charging the jury on the penalty.
Nonetheless, there is no merit to the assignments of error because the judge was given no opportunity to correct the error. The contemporaneous objection rule, La.C. Cr.P. art. 841, would at least have required that defendant object at the conclusion of the charge delivery, prior to retiring the jury. Defendant's objection after the retiring and without requesting that the jury be returned was not sufficient in my view.
DENNIS, Justice, dissenting.
I respectfully dissent.
Accepting the newly discovered witness' affidavit at face value, since an evidentiary hearing was not conducted, and considering the probable enhancement of the effectiveness of the defense's cross examination of the victim and the police officers which would result from the newly discovered witness' testimony, I believe, viewing the newly discovered evidence hypothetically, that "it would probably have changed the verdict or judgment of guilty." C.Cr.P. art. 851. I would prefer to affirm the conviction provisionally and remand the case for a hearing fully exploring the strength and weaknesses of the newly discovered evidence. Since the majority has decided to affirm the conviction finally and without qualification, I respectfully dissent.
LEMMON, Justice, dissenting.
At the very least defendant is entitled to a hearing on his motion for a new trial, at which he will have the opportunity to present the testimony of the nurse as to the events in the hospital's emergency room and to requestion the victim and the police officers in the light of the nurse's revelation.
Officer Kearney's alleged statement to the victim that they had captured the "black son of a bitch" who raped the victim is especially troublesome because of its suggestive nature and its appeal to prejudice. Moreover, the victim's described consternation (after the one-on-one confrontation) over her confusion and uncertainty casts doubt not only on that identification, but also on her subsequent courtroom identification. Because of the limited opportunity for the victim to view her assailant during the rape, there was little independent basis for her courtroom identification of the defendant. Therefore, the reliability of the allegedly unnecessarily suggestive one-on-one identification was vitally important, particularly in view of the victim's second questionable encounter with the defendant during her unexplained presence at the arraignment.
An evidentiary hearing will facilitate the decision on whether to grant a new trial in the interest of justice, and the hearing is warranted by allegations of police impropriety which casts doubt on the victim's courtroom identification.

On Application for Rehearing
DIXON, Chief Justice.
Rehearing is granted, and the case is remanded.
Upon reconsideration, a majority of the court has decided that this case must be remanded for an evidentiary hearing on the motion for a new trial, and that we cannot say that the newly discovered evidence is not so material that it would produce a different result if presented to a jury.
As noted in our previous opinion, the evidence is all circumstantial, except for the victim's identification of the defendant. The circumstantial evidence alone would not be sufficient, and it is the weight accorded the crucial identification evidence which could have been affected by the episode described in the affidavit in the motion for a new trial. The evidence of that episode at trial could have such an effect upon the acceptance by the jury of the identification testimony that the verdict would not be the same.
Furthermore, such new trial evidence could seriously weaken and impeach the testimony of the police who were present in the hospital when defendant was presented *715 to the victim for identification. Our previous assessment of the potential effect of the newly discovered evidence was in error.
Because there has been no evidentiary hearing on the motion for a new trial, the case is remanded to the trial court to take evidence on the motion, reserving to the trial judge the power to grant a new trial should he determine, consistent with this opinion, that the evidence requires it; if, on the other hand, he determines that a new trial should not be granted, the right to appeal from such ruling is reserved to the defendant; if a new trial is not granted and there is no such appeal, the conviction and sentence will be affirmed. State v. Simmons, 328 So.2d 149 (La.1976).
The case is remanded to the district court for further proceedings in accordance with this opinion.
WATSON, J., dissents.
BLANCHE, J., dissents, being of the opinion the application for rehearing should be denied.
MARCUS, J., dissents from the grant of a rehearing and remand for a hearing on the motion for a new trial.
NOTES
[*] Judges Lottinger, Edwards and Ponder of the Court of Appeal, First Circuit, participated in this decision as Associate Justices Ad Hoc, joined by Chief Justice Dixon and Associate Justices Marcus, Blanche and Watson.
[1] The following cases were reversed where the trial judge denied challenges for cause of prospective jurors: State v. Lewis, 391 So.2d 1156 (La.1980) (venireman was law graduate who had worked in district attorney's office as a law clerk and had application to him for a job pending at the time of trial); State v. Simmons, 390 So.2d 1317 (La.1980) (challenged juror was investigator with sheriff's department who knew majority of employees in the district attorney's office including four officers who were to testify on behalf of the state, and had worked closely with district attorney's office while earning a graduate law enforcement degree); State v. Monroe, 366 So.2d 1345 (La. 1978) (juror was assistant district attorney who worked in the same office with prosecuting attorney); State v. McIntyre, 365 So.2d 1348 (La. 1978) (venireman was retired captain of state police who had worked for the state for twenty years, had often served as a witness for the state, and had a long-standing relationship with officers called as witnesses).

The following were affirmedall cases in which challenges for cause (of law enforcement-connected jurors) were denied: State v. Baldwin, 388 So.2d 664 (La.1980) (first juror challenged was personal friend with police officer who testified at trial, second juror challenged was a prior assistant chief of police who had been retired for sixteen years, another challenged juror was acquainted with law enforcement people and had a brother-in-law who was a policeman, fourth prospective juror's son was a deputy and she knew other law enforcement officers); State v. Allen, 380 So.2d 28 (La.1980) (one challenged juror had a brother and grandfather who were policemen, another juror's husband worked for the district attorney's office as an investigator); State v. Sonnier, 379 So.2d 1336 (La.1979) (challenged venireman's brother was sheriff in another parish); State v. Carthan, 377 So.2d 308 (La.1979) (juror was acquainted with prosecuting attorney); State v. Qualls, 353 So.2d 978 (La.1977) (challenged juror's husband was a police officer); State v. Madison, 345 So.2d 485 (La.1977) (venireman's brother-in-law had been deputy sheriff for over a year); State v. Calloway, 343 So.2d 694 (La. 1976) (juror's nephew was a police officer); State v. Clark, 340 So.2d 1302 (La. 1976) (one challenged juror was volunteer coach for police combat team, another challenged juror was assistant to engineer in traffic court building); State v. Ballard, 337 So.2d 481 (La. 1976) (venireman was unpaid auxiliary policeman in connection with his civil defense duties); State v. Wilkerson, 326 So.2d 353 (La. 1976) (challenged juror was security guard at state penitentiary up until five years before trial).
[2] One argument in the motion for a new trial was that the court should consider in connection with the motion a polygraph examination which the defendant had taken and "passed," based on State v. Catanese, 368 So.2d 975 (La. 1979). The polygraph test, as noted in our original opinion, did not meet the requirements described in State v. Catanese, supra. The test had been taken before trial by defense counsel. The polygraph examiner knew nothing about the case except what he was told by the defense lawyer; he had not been otherwise informed of the evidence against the defendant.
[3] "STATE OF LOUISIANA

PARISH OF ST. TAMMANY
BE IT HEREBY KNOWN AND FOREVER REMEMBERED that on this day came and appeared before me, the undersigned Notary Public in and for the Parish of St. Tammany, State of Louisiana, Ruth vonUnwerth who did, after first by me being duly sworn, declare and depose solemnly as follows:
That her present mailing address is Route 1, Box 540, Madisonville, Louisiana, and that her telephone number is 845 7654, but that she is shortly contemplating removing from St. Tammany Parish to live at Route 1, Vilonia, Arkansas 72173.
Deponent further stated that on the evening of the arrest of Vernon Chapman, or the early morning hours of the day following, she was a registered nurse on duty in the Emergency Room of the St. Tammany Parish Hospital, and that she witnessed the `show-up' of Vernon Chapman when he was presented to the complaining witness, (the victim), in the foregoing and above captioned case.
Deponent further stated upon her oath that she remained with (the victim) nearly the entire time of her examination by Dr. Rodwig and that Dr. Rodwig then removed himself from the examining room when the curtains were drawn back and Vernon Chapman was exposed to (the victim). Immediately prior to the exposure of Vernon Chapman to (the victim), however, the deponent states that Spike Tierney, who is personally well known to the deponent, presented himself to (the victim) in a kneeling position in front of the wheelchair in which (the victim) was seated and stated `We've got that black son of a bitch out here. We want you to identify him for us!', or words very close to that effect. Deponent further stated that at that time (the victim) was extremely emotional and distraught and that she was weeping and wringing her hands. Deponent then stated that the curtains were drawn back and Vernon Chapman was presented to (the victim) in handcuffs and that (the victim) glanced at him for a split second and stated: `Yes.' At that moment, Spike Tierney exclaimed: `Get that black bastard out of here. We got his ass!'
Deponent further stated that while Spike Tierney was shouting the message above, (the victim) was seated in the wheelchair wringing her hands and repeating over and over, `Oh, I'm not sure. I'm not sure. I can't be sure, I'm so confused!'
Deponent further stated that she was never contacted by either counsel for the defendant or counsel for the State prior to the trial and came forth with the above information only after reading about the incident in the newspaper, and that to the best of her knowledge counsel for the defense was never aware of her possible involvement as a witness in the case until she contacted counsel for defendant following the conclusion of the trial and her having read about it in the newspaper.
 s/ Ruth vonUnwerth
 Ruth vonUnwerth
SWORN TO AND SUBSCRIBED BEFORE ME
THIS 13th DAY OF JUNE, 1980
s/ Garic Kenneth Barranger
GARIC KENNETH BARRANGER"

[4] State v. Jones, 344 So.2d 1036 (La.1977); State v. Tyler, 342 So.2d 574 (La.1977), cert. denied 431 U.S. 917, 97 S.Ct. 2180, 53 L.Ed.2d 227; State v. Robinson, 337 So.2d 1168 (La. 1976); State v. Russell, 334 So.2d 398 (La. 1976); State v. Porter, 330 So.2d 281 (La. 1976); State v. Credew, 328 So.2d 59 (La. 1976); State v. Howard, 325 So.2d 812 (La. 1976).
[5] In the application for rehearing there are presented complaints of the treatment of several other assignments of error. In each case, however, the correction of the claimed errors would not change the result.